

UNITED STATES OF AMERICA     :

                                      :

                                      :     ss: New Haven, Connecticut

                                      :

COUNTY OF NEW HAVEN         :

## AFFIDAVIT

I, Jay M. Salvatore, a Special Agent with the Drug Enforcement Administration, being duly sworn, deposes and states:

1.     I am employed as a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since December 2004.

2.     I am currently assigned to the DEA Hartford Resident Office ("HRO").  I have attended and successfully completed the DEA's Basic Agent Training School.  In addition, I have attended other specialized drug training schools conducted by the DEA; have testified on several occasions in grand jury proceedings, where my testimony has contributed to the indictment of numerous individuals; have been involved with the execution of state and federal search and seizure warrants where controlled substances have been seized; have participated in several investigations in which federally authorized wire interception orders were issued; and I have participated in numerous arrests of individuals charged with federal and/or state narcotics violations.  I am currently assigned to conduct drug and money laundering investigations at the DEA's HRO.

3.     In my current position with the DEA HRO, my duties include investigating violations of the Connecticut General Statutes and the Controlled Substances Act, including, but not limited to, investigating those drug traffickers and organizations responsible for diverting and distributing pharmaceuticals and other drugs within the State of Connecticut.  Due to the abuse and trafficking of opioid-based pharmaceutical pills and the correlated abuse and trafficking of

heroin and fentanyl, the DEA HRO is also actively conducting investigations into individuals and organizations involved with the distribution of heroin and fentanyl.

4.      Prior to being employed by the DEA, I was a sworn Police Officer in the Town of Wethersfield, CT for approximately three and a half years. As a certified Police Officer in the State of Connecticut, this Affiant conducted numerous investigations into violations of the law, including narcotics violations.

5.      This Affiant has directed and coordinated electronic surveillance, controlled purchases of drugs, physical surveillance, and undercover activities as well as debriefed and managed confidential sources. This Affiant is familiar with the manner in which individuals obtain, finance, store, manufacture, transport, and distribute their illegal drugs.

6.      I am also an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. This affidavit relates to an investigation, in which I have been involved, of two heroin overdose deaths that occurred in Enfield, Connecticut on or about Friday, August 26, 2016 and on or about Thursday, October 27, 2016. In particular, I am investigating violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (possession with intent to distribute and the distribution of, heroin and fentanyl).

7.      I make this affidavit in support of: (1) a complaint and request for an arrest warrant charging Jonathan REED (with a date of birth (xx/xx/1985) that is known to me) with possession with intent to distribute and distribution of, a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (2) an application for a search and seizure

2

warrant for the cellular telephone contents and records of a cellular telephone identified as follows:

    a.   One (1) cellular telephone, which is assigned telephone number (860-707-3652) and an International Mobile Equipment Identity ("IMEI") of 990005716691750, which is serviced by Verizon Wireless.  This cellular telephone has a subscriber of Shirley Reed with an address of 23 Silver Lane, Enfield, CT.   Through various aspects of this investigation, to include: toll record analysis, witness statements and an analysis of text messages, investigators believe that the telephone was utilized by JONATHAN REED in furtherance of his possession with intent to distribute and distribution of heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  This cellular telephone will be referred to herein as "the subject telephone."

8.    This affidavit does not set forth all of the facts and evidence that I have gathered during the course of the investigation of this matter.  Rather, this affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant and search warrant, and does not set forth all of my knowledge about this matter.  The statements contained in this affidavit are based, in part, on information provided by Special Agents and Task Force Officers of the DEA, as well as other officers from state and local agencies, including but not limited to the Enfield Police Department ("EPD"), on law enforcement officers' review of seized electronic evidence (including stored text messages), and on the experience and training of the Affiant.

## BACKGROUND

9.    This investigation by the DEA and the EPD involves the case of an untimely drug-

overdose death of a 35-year old man, hereafter referred to as VICTIM #1, and an untimely drug-overdose death of a 36-year old man, hereafter referred to as VICTIM #2. Based on the investigation of law enforcement officers, investigators believe that VICTIM #1 and VICTIM #2 were provided with heroin and/or fentanyl by Jonathan REED who was utilizing a cellular telephone with the number 860-707-3652 to facilitate that distribution. VICTIM #1, who was residing with his mother at the time of his death at a private residence in Enfield, Connecticut, was found deceased in his bedroom by his mother's live-in boyfriend, Witness #1, during the morning hours of August 26, 2016. While responding EPD units were conducting their initial investigation into the events surrounding VICTIM #1's death, investigators took possession of various items, which included VICTIM #1's cellular telephone and multiple wax envelopes stamped "Diesel," approximately six of which were not used and contained suspected heroin.

10.    VICTIM #2, who was residing at a private residence in Enfield, Connecticut, was found outside the residence unresponsive.  VICTIM #2 was transported to Johnson Memorial Hospital where VICTIM #2 died.  The scene was initially treated as a medical emergency by the EPD resulting in no evidence seized at the time; however, VICTIM #2's mother later provided related evidence to the EPD.

## PROBABLE CAUSE

### RESPONSE TO OVERDOSE: VICTIM #1

11.    On August 26, 2016, at approximately 0952 hours, EPD Officer Gutska was dispatched to a medical call of service regarding an unresponsive person at a private residence located on Pheasant Hill Drive in the town of Enfield, CT.  Upon arrival, Officer Gutska met with EPD Sergeant Montas, Officer Gerrish and members of the Enfield Emergency Medical Service ("EMS").  As law enforcement officers and medical personnel approached the residence, they were

4

directed to the second floor south bedroom at the top of the stairs.  Upon entering the bedroom, Office Gutska observed VICTIM #1 in a sitting position hunched over with his head on the coffee table.  VICTIM #1's skin had already turned blue.  Rigor Mortis was present throughout his body as well as lividity.  In VICTIM #1's hand was an Xbox controller.  The television had Madden 2017 (the football videogame) on the screen and the game was paused.

12.      At approximately 1006 hours, VICTIM #1 was pronounced dead by Enfield EMS Paramedic Peter Swanson.

13.      Officer Gutska then interviewed Witness #1, who provided a written statement.  In substance, Witness #1 stated that on August 25, 2016, the prior evening, at approximately 2200 hours, VICTIM #1 had returned home from work.  Witness #1 and VICTIM #1 had a brief conversation about baseball before VICTIM #1 went to his room for the evening.  On August 26, 2016, at approximately 1000 hours, Witness #1 wanted to check on VICTIM #1 after VICTIM #1's mother was concerned that VICTIM #1 should have already been up for work.  Witness #1 attempted to call VICTIM #1 and upon receiving no answer, he went to the bedroom and located VICTIM #1 as previously described.  Witness #1 stated that VICTIM #1 was already blue so Witness #1 called 911.  Witness #1 stated that he did not touch anything.  Witness #1 further advised officers that VICTIM #1 had a history of heroin use, however, the family was under the impression that he was not using heroin at the time.

14.      Law enforcement officers also spoke with the mother of VICTIM #1, Witness #2. She said VICTIM #1 was generally healthy with no known medical problems.  Witness #2 had last seen VICTIM #1 alive at 2200 hours on August 25, 2016.

15.      At approximately 1030 hours on August 26, 2016, EPD Detective Sergeant Casile and Detectives Weshe and Bailey responded to the scene.  Further investigation of the surrounding

area revealed an empty white wax envelope (with a green stamp "Diesel" and a picture of a gas pump) located inside of a Taco Bell box that was found on the coffee table. Also found inside the Taco Bell box was a pen tube that had been cut in half. One half of the pen tube appeared to have a powdered residue inside it, consistent with the item being used to snort heroin. On the coffee table, in addition to the Taco Bell box, detectives located a partial bundle of suspected heroin; 6 white wax envelopes (green stamp "Diesel" and a picture of a gas pump) containing suspected heroin.

16.     At approximately 1040 hours, the Office of the Chief Medical Examiner ("O.C.M.E.") was contacted and assigned VICTIM #1 ME case number 16-13757. At approximately 1300 hours, O.C.M.E. transport arrived at the scene and subsequently removed VICTIM #1's body.

17.     In continuing with the initial investigation, law enforcement officers at the scene located VICTIM #1's cell phone, an IPhone, which was locked. EPD Detective Lewis was able to unlock the IPhone using VICTIM #1's fingerprint. Once the phone was unlocked, officers were able to observe two separate conversations involving drug related activity from the evening before VICTIM #1 died of the overdose. One conversation occurred with 860-324-2933 (the number listed to "Joey Black" in VICTIM #1's cellular phone contacts) and the other conversation occurred with phone number 860-707-3652. The IPhone was seized at the scene, returned to VICTIM #1's family, and is now back in the custody of law enforcement. The conversations were as follows with the most relevant portions in bold:

**Joey Black 860-324-2933 (V1 - VICTIM #1, JB – Joey Black):**

> #1: Outgoing text at 1948 hours: V1 - Madden Tonight? I have it too

> #2: Incoming text at 1949 hours: JB - Yeah ill try to sneak 1 game in

#3: Outgoing text at 1949 hours: V1 - Ok.  Not home now.  What's your timeframe?

#4: Incoming text at 1950 hours: JB - I gotta get up at 5 for work and prolly won't be home for like an hour or so

**#5: Outgoing text at 1950 hours: V1 -  And what's ruthless' number? I'm pondering grabbing a few. Don't worry. Haven't since the last time. Incoming message at 1950 hours: JB - Ruthless (JB sent contact info for Ruthless)**

**#6. Incoming text at 1951 hours: JB - Just don't go crazy that's all**

**#7. Outgoing text at 1952 hours:  V1 - I'm def not.  Don't worry.**

**#8. Incoming text at 1952 hours: JB - I gotta detox myself this weekend actually.  Started going in too much Cuz the kidney stone.**

**#9. Outgoing text at 2024 hours: V1 - Does ruthless not like to text?**

**#10. Incoming text at 2027 hours: JB - Text in code lol**

**#11.  Incoming  text  at  2027  hours:  JB -  He's  paranoid,  like  he's  El Chapo to the feds.**

#12. Outgoing text at 2028 hours: V1 - Yeah. I just said can I come through.

#13. Incoming text at 2028 hours: JB - That's str8

#14. Incoming text at 2028 hours: JB - Call him if he doesn't respond

#15. Outgoing text at 2032 hours: V1 - Ok.

#16. Outgoing text at 2032 hours:  V1 - What's your timeframe for being ready for a game?

#17. Incoming text at 2034 hours: JB - 20-30

#18. Incoming text at 2035 hours: JB - If it's too late I might have to wait till tomorrow

#19. Incoming text at 2035 hours: JB - Actually I forgot it takes mad long to install it …fuck

#20. Incoming text at 2035 hours: JB - I gotta go to sleep in like an hour

#21. Incoming text at 2036 hours: JB - If not tonight I'll be home all weekend, feeling like shit so I won't wanna be going out

#22. Outgoing text at 2040 hours: V1 - Ok.

18.     The above text conversation began on August 25, 2016, at approximately 1948 hours, and continued until approximately 2040 hours.  The contact that "Joey Black" sent VICTIM #1 was "Ruthless" phone number: 860-707-3652.   The following text conversation occurred between VICTIM #1 and 860-707-3652 "Ruthless."  The most relevant portions are in bold:

**860-707-3652 conversation (R – Ruthless, V1 – VICTIM #1)**

#1. Outgoing text at 1958 hours: V1 - Yo. Can I come through in a little while?

#2. Incoming text at 2059 hours: R - Yeh I'm on a walk…how long u thinkin?

#3. Outgoing text at 2059 hours: V1 - Prob like 30 mins

#4. Incoming text at 2100 hours: R - That might be good jus hit me shud b back round then too

#5. Outgoing text at 2100 hours: V1 - Ok cool.

#6. Outgoing text at 2121 hours: V1 - be around in 10

#7. Incoming text at 2144 hours: R - Yo u wanna do it real slick? I'm

8

walking round the block wit my mom's going up Plainfield toward
Weymouth then towards pioneer n Dow. To my crib.

#8. Outgoing text at 2145 hours: V1 - Ok

**#9. Incoming text at 2146 hours: R - U driving the jetta? I'll look out
for u...if u c me jus act like u driving by n say wuts up I'll just act like
us driving by n tell u I'll call u...I got it on me now ...so come now**

**#10. Outgoing text at 2146 hours: V1 - Yea**

**#11. Incoming text at 2147 hours: R - I'll jus walk up to ur window jus
keep the lights off n hand it to me real slick I'll jus drop the other on ur
lap or seat depending on which side**

**#12. Incoming text at 2147 hours: R - I meant keep dome lights off**

**#13. Incoming text at 2208 hours: R - Forgot to say those r no joke
better than before so jus go slo**

**#14. Outgoing text at 2208 hours: V1 - Ok. Cool**

19.    The above text conversation with "Ruthless" began on August 25, 2016, at
approximately 1958 hours, and finished at approximately 2208 hours. VICTIM #1 had also placed
two phone calls to "Ruthless" one occurring at approximately 2126 hours, lasting 40 seconds, and
the second occurring at approximately 2144 hours, lasting 31 seconds.  Scene shots of the above
two text conversations were taken and seized as evidence by the EPD.

20.    Based on this Affiant's training and experience, I believe that the above two
conversations contain numerous references to the distribution of illegal drugs.  During the first
conversation between VICTIM #1 and "Joey Black", within messages #5 through #16, VICTIM
#1 is asking the "Joey Black" for "RUTHLESS' contact information because VICTIM #1 was

"pondering grabbing a few. "Joey Black" forwards VICTIM #1 "RUTHLESS's" contact information and tells VICTIM #1, "Just don't go crazy that's all". VICTIM #1 reassures "Joey Black" stating "I'm def not. Don't worry." This Affiant believes that the reference to "RUTHLESS" is actually the drug dealer known to both VICTIM #1 and "Joey Black" and when VICTIM #1 writes that he "pondering grabbing a few," VICTIM #1 is actually stating to "Joey Black" that he was thinking about purchasing illegal drugs. When "Joey Black" warns VICTIM #1 "Just don't go crazy that's all," the Affiant believes that "Joey Black" is speaking to the potency and amount of illegal drugs that VICTIM #1 might ingest.

21.     Within messages #9 thru #16, VICTIM #1 asks "Does ruthless not like to text?" and was instructed by "Joey Black" to "text in code." "Joey Black" further explains that "Ruthless" is paranoid and makes the reference "like he's El Chapo to the feds." "Joey Black" continues by instructing VICTIM #1 to call if "Ruthless" doesn't text VICTIM #1 back. This Affiant knows from his training and experience that people who traffic in illegal drugs are commonly paranoid and feel more comfortable communicating with possible purchasers in code. It is this Affiant's belief based upon the above conversation that both "Joey Black" and VICTIM #1 have participated in prior illegal drug transactions with "RUTHLESS." In message #8, "Joey Black" actually texts "I gotta detox myself this weekend."

22.     Based on the Affiant's prior training and experience in particular with regards to narcotics trafficking activities, Affiant believes that the entire text conversation between VICTIM #1 and "RUTHLESS" was regarding the purchasing of narcotics. The two first discuss when and where the deal will occur. "RUTHLESS" instructs VICTIM #1 to be careful and that he will be walking around the block with his mother and gives his location in message # 7 "You wanna do it real slick? I'm walking round the block wit my mom's going up Plainfield toward Weymouth then

towards pioneer n Dow. To my crib." "RUTHLESS" confirms with VICTIM #1 that VICTIM #1 is driving the Jetta and instructs VICTIM #1 on how the transaction will occur in message #9 "U driving the jetta? I'll look out for u . . . if u c me jus act like u driving by n say wuts up I'll just act like us driving by n tell u I'll call u . . . I got it on me now . . . so come now". This Affiant believes that the statement "I got it on me now" is a reference to "RUTHLESS" having the illegal drugs on his person at that time. "RUTHLESS" continues in message #11 stating exactly what he wants VICTIM #1 to do "I'll jus walk up to ur window jus keep the lights off n hand it to me real slick I'll jus drop the other on ur lap or seat depending on which side." This Affiant believes that when he makes the statement "hand it to me," "RUTHLESS" is referring to VICTIM #1 handing him currency and the text message "I'll jus drop the other on ur lap" is referring to the passing of illegal drugs to the VICTIM #1.

23.     In message # 13 "RUTHLESS" sends "Forgot to say those r no joke better than before so jus go slo." This Affiant believes that at this point in the conversation, the illegal drug transaction had already occurred and "RUTHLESS" is warning VICTIM #1 about the potency of the illegal drug that he had just sold to VICTIM #1.

24.     On September 29, 2016, EPD Detective Wesche received a laboratory controlled substance report from the State of Connecticut Division of Scientific Services documenting that all items seized at the initial scene were tested and determined to contain Fentanyl: Item #1A1: Six powders each in a glassine bag stamped "Diesel", Item #1A2: One torn glassine bag stamped "Diesel" with residue and Item #1A3: Two pieces of plastic pen with residue.

25.     On November 8, 2016, James Gill, M.D., Chief Medical Examiner, Office of the Chief Medical Examiner, State of Connecticut issued a report, following the autopsy of VICTIM #1 and listed his cause of death as "acute fentanyl and ethanol intoxication."

26. On April 10, 2017, Task Force Officer Christopher Devanney, met with VICTIM #1's family to inquire about the VICTIM #1's cellular phone. TFO Devanney was told that the family still had the phone since it had been returned to them and that they had not touched it or rebooted it. TFO Devanney then took custody of the cellular phone from VICTIM #1's mother.

27. On April 14, 2017, Detective Michael Chaves of the Monroe Police Department, who is also a Federal Task Force Officer/Computer Forensics Specialist, analyzed VICTIM #1's cellular phone and was able to extract all data contained therein. Among the information extracted were the aforementioned text messages, including the times in which the messages were sent and received.

### TELEPHONE SUBSCRIBER AND TOLL RECORD ANALYSIS

26. On September 19, 2016, Cellco Partnership doing business as Verizon Wireless was served by the DEA with an Administrative Subpoena requesting subscriber information and tolls pertaining to phone number: 860-324-2933 (number listed to "Joey Black" in VICTIM #1's cellular phone contacts) and 860-707-3652 (number listed to "Ruthless" as the contact that was sent to VICTIM #1's phone).

27. The requested information was shortly thereafter returned from Verizon Wireless. Phone number: 860-324-2933 was subscribed to Joseph BLACKWELDER of 27 Pleasant Street Apartment A6, East Windsor, CT. Phone number: 860-707-3652 was subscribed to Shirley Reed of 23 Silver Lane, Enfield, CT, and the phone had an IMEI of 990005716691750.

28. The returned toll records showed 16 contacts on August 25, 2016, between phone number 860-707-3652 (RUTHLESS) and 860-729-5512 (VICTIM #1). As previously documented, VICTIM #1 had a combined 14 incoming and outgoing text messages with 860-707-3652 in addition to two phone calls.

29.    An EPD "in house" check of phone number 860-707-3652 (RUTHLESS's number)

showed that the number was previously used by Jonathan REED (with a date of birth (xx/xx/1985)

that is known to me) of 23 Silver Lane, Enfield, CT.   REED had provided phone number: 860-

707-3652 to the EPD during a call of service on 06-09-2015.   REED's address on Silver Lane is

also in the same neighborhood of Plainfield Street and Pioneer Drive, which was mentioned in the

above documented text messages.   Through database checks and based upon my own training and

experience, I believe that Shirley Reed is the subscriber of the subject telephone and that her son,

JONATHAN REED uses the subject telephone.

30.    I believe that the frequency of the telephone contact and content of the text

messages between REED and VICTIM #1, coupled with other aspects of this investigation, support

that REED was in fact a source of supply of heroin and fentanyl for VICTIM  #1 on August 25,

2016—the day before VICTIM #1 overdosed.

**INFORMATION REGARDING CELLULAR TELEPHONES AND
THE REQUESTED SEARCH WARRANT**

31.    Based on my training, experience, I know that the aforementioned subject telephone

may have some or all of the capabilities that allow it to serve as a wireless telephone, digital camera

and video recorder, portable media player, global positioning system ("GPS") navigation device,

a hand-held radio, and a personal digital assistant ("PDA").   In my training and experience,

examining data stored on devices of this type can uncover, among other things, evidence that

reveals or suggests who possessed or used the particular device, as well as evidence relating to co-

conspirators with whom the device was in contact.

32.    I request permission to seize and search the subject telephone for evidence relating

to the drug related overdose of VICTIM #1 and, as will be explained below, for evidence relating

to the drug overdose of VICTIM #2, the unlawful distribution, and the possession with intent to

distribute, narcotics, including any evidence of communications between REED and other potential co-conspirators involved in the distribution of narcotics as well as other criminal acts. Based on my training and experience, and as set forth in this affidavit, I know wireless telephones are used to communicate efforts to conduct criminal activities and it is likely that the subject telephone was used by REED to communicate with potential co-conspirators in the unlawful distribution of narcotics. Furthermore, based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of text communications between co-conspirators who distribute narcotics, or conspire to do so. I know that internet browsing history in wireless phones can contain evidence of internet searches for locations and addresses used for storing and distributing narcotics. Also based on my training and experience, wireless phones may contain videos and images of co-conspirators, possible locations to ship, receive, or store narcotics, the quantity of narcotics and/or shipping packages within which the narcotics are concealed, and firearms, as firearms are generally considered tools of the trade in narcotics activity. Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones, including phones used by those involved in the distribution of narcotics:

     a.    the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of said telephone;

     b.    the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

     c.    descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

     d.    any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

     e.    any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

     f.    GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.      saved searches, locations, and route history in the memory of said devices;

h.      internet browsing history, to include, internet searches in the memory of said device; and

i.      Images and videos in the memory of said device.

33.    It is also requested that the Court authorize the retrieval of the above described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.  I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant.  Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure.  Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

34.    It is also requested that the warrant be deemed executed once the subject telephone has been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

35.    The warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

36.    As described above and in Attachment A, this application seeks permission to search and seize things that the subject telephone might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can

sometimes be recovered with forensics tools.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

37.     Searching for the evidence described in Attachment A may require a range of data analysis techniques.  In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant.  Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information.  These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment A, or perusing all stored information briefly to determine whether it falls within the scope of the warrant.  In light of these difficulties, the DEA, or other law enforcement agency, intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

*****

## RESPONSE TO OVERDOSE: VICTIM #2

38.     On October 27, 2016 at approximately 2023 hours, the EPD and the Enfield EMS responded to a private residence on Haynes Street for a report of an unresponsive male.  Upon arrival, VICTIM #2 was found outside of the home unresponsive.  VICTIM #2's mother, Witness #3, was also present at the scene. VICTIM #2 was transported to Johnson Memorial Hospital where he later passed away.  Because the scene was initially treated as a medical emergency, no evidence was recovered at that time.

39.     In January 2017, EPD Detective Callaghan spoke with Witness #3 who told Detective Callaghan that VICTIM #2's death was the result of a heroin/fentanyl overdose, according to the autopsy report.  Witness #3 also reported that she found what she believed to be illegal drugs and VICTIM #2's cell phone while she was cleaning VICTIM #2's room.

40.     On January 4, 2017, Detective Chamberland and Detective Callaghan met with Witness #3 at her residence.  Witness #3 provided detectives with a black cell phone that she stated belonged to VICTIM #2.  Witness #3 also showed law enforcement a sock that had what appeared to be two bundles of suspected heroin in white wax bags concealed within that she had recovered in the room of VICTIM # 2 after his death.  Witness #3  then stated to Detective Callaghan that VICTIM #2 had confided in her that JONATHAN REED was VICTIM #2's main supplier for heroin.  Witness #3 also knew that REED lived nearby on Silver Lane, Enfield, CT.  Detective Callaghan took custody of the suspected heroin and phone and transported them to the Enfield Police Department.  Once at the EPD, the suspected heroin was found to be 20 wax bags each containing an unknown white powder. Detective Callaghan field tested the suspected heroin using a #33 fentanyl test kit which yielded a positive presumptive result for fentanyl.  Both the phone and suspected heroin/fentanyl were processed as evidence at the EPD.

41.     On January 24, 2017, Detective Callaghan removed VICTIM #2's phone from evidence and physically examined it.  As a result of this examination, Detective Callaghan was able to retrieve multiple text messages in the phone's inbox and outbox to and from phone number 860-707-3652.  There were no other text messages located.  As noted earlier in this affidavit, this is the same number, which was identified as the number used by JONATHAN REED based upon an EPD "in house" check.  The following partial text message conversation was composed using the text messages located by Detective Callaghan in VICTIM #2's phone's inbox and outbox with the most relevant parts in bold:

1. October 20, 2016 1125 hours – (incoming text) jus grabbed some real good games

2. October 20, 2016 1720 hours – (incoming text) Yeah I'll b her jus call me I'll answer

3. October 20, 2016 1823 hours – (incoming text) I got a ride so if u don't I got u

4. October 21, 2016 1724 hours – (incoming text) Good thing we didn't go to mobil mad boys

5. October 21, 2016 1727 hours – (outgoing text) I know that would've sucked.

6. October 22, 2016 1210 hours – (outgoing text) yo whats the deal where u at

7. October 22, 2016 1256 hours – (outgoing text) yo where u at

8. October 22, 2016 1302 hours – (outgoing text) well thought u were coming

9. October 22, 2016 1304 hours – (outgoing text) hello wher u at

10. October 22, 2016 1309 hours – (outgoing text) yo r u coming or not at least tell that

11. October 22, 2016 1328 hours – (outgoing text) where u at

**12. October 23, 2016 1212 hours – (incoming text)  ur gonna like that game**

**13. October 23, 2016 1825 hours – (outgoing text) ya ok 15 min I knew I was right**

**14. October 23, 2016 1826 hours – (incoming text) huh? hit u in a few b jus cleaning up the vacuum**

**15. October 24, 2016 1632 hours – (outgoing text) yo will u b around in like a hour or two and have a ride to me I won't have a ride to u**

16. October 24, 2016 1743 hours – (incoming text) yeh hit me

17. October 24, 2016 1744 hours – (incoming text) jus finished mowing lawn working on car so hit me

18. October 24, 2016 1931 hours – (incoming text) k

19. October 25, 2016 1305 hours – (incoming text) be there in 25

On October 27, 2016, the fatal overdose of VICTIM #2 occurred.  The following incoming text messages were received by VICTIM #2's phone after the overdose.

**20. October 28, 2016 2254 hours – yo this new game its called superfire u gotta play it**

**21. October  28, 2016 2255 hours – meant to tell u last night**

**22. October 29, 2016 1428 hours – missing out**

**23. October 30, 2016 1424 hours – yo dog u alive?**

**24. October 30, 2016 1825 hours – wtf can't answer me**

**25. October 30, 2016 2016 hours – yo if u don't respond im comin to ur house to make sure u ok**

26. October 31, 2016 1356 hours – yo what the heck is up wit u u ok

27. November 1, 2016 0947 hours – got a ride when u want me to stop by

**28. November 1, 2016 1036 hours – yo dog I need that ur not gonna fuck me r u?**

**29. November 1, 2016 1231 hours – yo dog I comin to ur house to make sure u ok**

42.     Based on this Affiant's training and experience, I believe that the above text conversation contains numerous references to the distribution of illegal drugs.  Within this conversation, there were multiple references "games."  This Affiant believes that "games" is a code word that refers to narcotics.  As previously documented in this affidavit, REED uses code words in an attempt to conceal drug transactions.  The use of code words is common for drug users and dealers to disguise their business and often amounts and prices are not mentioned because the amounts and prices are already common knowledge between a regular supplier and customer. Within message #4, VICTIM #2 receives the following text message: "Good thing we didn't go to mobil mad boys" and responds with "I know that would've sucked."  This Affiant believes that the reference to "mad boys" was code for law enforcement.  Within messages #6 - #11, VICTIM #2 receives multiple text messages that are consistent with buyers and sellers of drugs determining

meeting location and times.

43.     Within text messages #20 and #21, which occurred after the fatal overdose, VICTIM #2 received "yo this new game its called superfire u gotta play it" and "meant to tell u last night." The Affiant believes that these messages contain warnings regarding the potency of the drug. As previously documented, the remaining text messages were received after the fatal overdose. Within these messages, the sender was repeatedly inquiring where VICTIM #2 was and within message #23 even asking if VICTIM #2 was alive. The Affiant believes that these text messages reveal knowledge regarding the potency of the illegal drug and concern for the welfare of VICTIM #2. Within message #28, VICTIM #2 received text message "yo dog I need that ur not gonna fuck me r u". This Affiant believes that this message could possibly be referring to money that VICTIM #2 might owe.

44.     On February 17, 2017, James Gill, M.D., Chief Medical Examiner, Office of the Chief Medical Examiner, State of Connecticut issued a report, following the autopsy of VICTIM #2 and listed his cause of death as "complications of acute intoxication due to the combined effects of fentanyl, furanyl fentanyl, and heroin."

45.     VICTIM #2 was a known heroin user to the EPD. On March 20, 2015, EPD Officer Ryan forwarded information to EPD Police Narcotics Intelligence stating that while giving VICTIM #2 a courtesy ride, VICTIM #2 confined in Officer Ryan that John REED sells heroin out of his residence on Silver Lane.

46.     On July 6, 2015, the EPD received an anonymous tip stating that Jonathan REED, who resides on Silver Lane is selling heroin. The anonymous tip also included information pertaining to REED's vehicle and particulars regarding the residence. On July 8, 2015, EPD Officer Castle forwarded information to Detectives Callaghan and Chamberland stating that

VICTIM #2 had contacted Officer Castle and told Officer Castle that John REED, who lives on Silver Lane, deals heroin.

47.     I believe that the frequency and content of the text messages between REED and VICTIM #2, coupled with other aspects of this investigation, support that REED was in fact a heroin source of supply for VICTIM #2 in the days before VICTIM #2 overdosed.

48.     For the reasons previously discussed in detail, I request permission to seize and search the subject telephone for evidence relating to the drug related overdoses of VICTIM #1 and VICTIM #2, as well as any information on the subject telephone regarding the unlawful distribution, and the possession with intent to distribute, heroin and fentanyl.

## CONCLUSION

49.     I submit that this affidavit supports probable cause for a complaint and arrest warrant for Jonathan REED for possession with intent to distribute, and distribution of, a mixture and substance containing a detectable amount of heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and for a search warrant to seize the subject telephone and search it for the items described in Attachment A as evidence, fruits, and instrumentalities of the crimes of the unlawful distribution of heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).


Jay M. Salvatore
DEA Special Agent

Subscribed and sworn to before me this 24 day of
April. 2017

/s/
SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

23

## ATTACHMENT A

All records contained in the subject telephone, which will be in DEA custody after it is

seized to include the following:

1. the telephone number, ESN number, serial number, and SIM card number of the subject telephone;
2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the subject telephone;
3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes (violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C));
4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the subject telephone;
5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the subject telephone, such as passwords, sign-on codes, and program design;
6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;
7. saved searches, locations, and route history in the memory of said subject telephone;
8. internet browsing history, to include, internet searches in the memory of the subject telephone;
9. images and videos in the memory of the subject telephone; and,
10. evidence of user attribution showing who used or owned the subject telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of

evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage (such as flash memory or other media that can store

data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images

contained in the above-described subject telephone may be reproduced by printing said stored

electronic information or otherwise reproducing said stored electronic information, by converting

said stored electronic information, or by copying said stored electronic information into storage in

another device/s.

